**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**TRAVIS BARRETT NAVE,**

**Plaintiff,**

**vs.**                                          **Case No. 4:12cv225-MP/CAS**

**KATHLEEN FUHRMAN,**

**Defendant.**

_____/

## <u>SECOND REPORT AND RECOMMENDATION</u>

At the conclusion of the extended discovery period, *see* docs. 54, 69 and 73, Defendant filed a motion for summary judgment, doc. 74.  The pro se Plaintiff was advised of his obligation to respond to the motion under Rule 56 and N.D. Fla. Loc. R. 56.1.  Docs. 76, 80.

Plaintiff initially filed numerous documents as evidence, doc. 79, but did not file a memorandum or statement of material facts.  An Order was entered again advising Plaintiff of his burden under N.D. Fla. Loc. R. 56.1 to respond to the summary judgment motion.  Doc. 80.  In particular, Plaintiff was informed that the Court would "not review Plaintiff's evidence to look for a possible disputed fact, nor [would] the Court craft Plaintiff's own arguments for him."  *Id.* at 2.  Plaintiff was required to submit a

memorandum opposing the summary judgment motion and a statement of disputed fact[1] in which Plaintiff points "to the evidence which he believes provides a dispute of fact such that this case should go to trial." *Id.* After three extensions of time, docs. 77-78, 81-83, 85, Plaintiff filed a memorandum of law, doc. 86, and a separate statement of material facts, doc. 87, with additional evidence.

Thereafter, Defendant filed a motion seeking leave to file a reply with additional evidence, consisting of two documents recently drafted and provided to the dieticians of the Department of Corrections on May 15, 2014. Doc. 88. Defendant stated that she "wishe[d] to argue in her reply that Plaintiff's case, at least in part, is moot as a result of the contents of these documents." *Id.* Defendant's motion was denied in part because Defendant was not actually seeking to respond or clarify any point made by the Plaintiff. Doc. 89. Rather, the "reply" appeared to present new argument not previously raised by Defendant in the summary judgment motion, doc. 74. *Id.* That being the case, Defendant Fuhrman was advised that if she desired to alter the basis for summary judgment and argue mootness,[2] she could do so by June 11, 2014, by filing "an

---

[1] Plaintiff's statement does not contain page 10, either online or in the hard copy of the file. That omission is immaterial because any statement must be supported by Plaintiff's evidence, which has been fully reviewed. However, the omission does alter the page numbering after page 9. Pages referenced herein are to the page number on CM/ECF, the electronic docket.

[2] The mootness argument is not premised on a change in policy or procedure, but new "documents drafted by the Defendant, entitled 'Avoiding Gluten Cross-Contamination In a Non-dedicated Kitchen' and 'Substitutions for a Gluten-free Diet", which were drafted by the Defendant and provided to the dieticians of the Department of Corrections (hereafter "the Department") on May 15, 2014 . . . ." Doc. 88 at 1. Those documents have not been submitted for review, but the titles suggest they are efforts to implement the procedures already created by Defendant Fuhrman as will be discussed ahead. It is true that Article III of the Constitution limits the power of federal courts to live cases or controversies, and a Court must determine whether or not

amended summary judgment motion which contain[ed] all relevant evidence."  *Id.*
Defendant filed nothing further and, thus, the summary judgment motion as originally
filed has been considered along with Plaintiff's response.

**Claims raised**

The operative pleading is Plaintiff's second amended complaint, doc. 16.  Plaintiff
sues Kathleen Fuhrman, the Public Health Nutrition Program Manager for the Florida
Department of Corrections, who is a dietitian and charged with the creation of all menus
for the Department.  Doc. 16 at 5.  Plaintiff alleges he was diagnosed with celiac sprue
and prescribed a gluten-free therapeutic diet.  *Id.* at 5-6.  Plaintiff alleges that the
Department's gluten-free diet menu, initially created in 2010 and revised several times
thereafter, includes food items that contain gluten.  *Id.* at 6-8.  Plaintiff claims he suffers
injury from the gluten served.  *Id.* at 9-12.  Plaintiff further contends Defendant has not
provided recipes or instructions in preparing and serving gluten-free food without
contamination, has not provided a list of foods that may be substituted, and improperly
includes food with gluten on the gluten-free menu.  *Id.* at 12-19.  Plaintiff contends food
service workers cross contaminate[3] Plaintiff's food with gluten.  *Id.* at 16-17, 21-22.

---

subsequent changes have rendered a lawsuit moot.  *See* Univ. of S. Ala. v. Am.
Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999) (stating that "a federal court is
obligated to inquire into subject matter jurisdiction sua sponte whenever it may be
lacking.").  Notwithstanding Defendant's abandonment of this argument, it does not
appear that this case is moot because the changes "have not so fundamentally altered"
the framework so "as to render the original controversy a mere abstraction."  *See*
Naturist Soc., Inc. v. Fillyaw, 958 F.2d 1515, 1520 (11th Cir. 1992) (noting that "[w]here
a superseding statute leaves objectionable features of the prior law substantially
undisturbed, the case is not moot.").  New guidance documents do not remove the issue
challenged in this case.

[3] "Cross-contamination is when gluten-free food comes into contact with food that
does contain gluten."  Plaintiff's Ex. N (doc. 87 at 8).

Plaintiff alleges Defendant has violated his Eighth and Fourteenth Amendment rights and seeks a declaratory judgment along with a permanent injunction and monetary damages. *Id.* at 23-25.

## Arguments raised

Defendant's motion for summary judgment, doc. 74, argues in relevant part that Plaintiff is not gluten intolerant, has not been injured due to gluten, that Plaintiff's claim of cross-contamination in food service is unsupported and false, that staff and inmate food workers are trained, procedures and rules have been implemented concerning food service and therapeutic diets, no constitutional violations have occurred, Defendant has not been deliberately indifferent to a serious medical need, and supervisory liability is not actionable in § 1983 cases. Doc. 74 at 14-19. Defendant also raises § 1997e(e) as a defense and contends Plaintiff may not bring this lawsuit for monetary damages because he has not been physically injured. *Id.* at 19-20. Finally Defendant asserts Eleventh Amendment immunity, qualified immunity, and is not entitled to injunctive relief. *Id.* at 20-24.

## Legal standards governing a motion for summary judgment

On a motion for summary judgment, the Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id.* An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).

Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano, 129 S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of

evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement constitutes grounds for denial of the motion."  The Local Rule also provides that the statement "shall reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source."  The Local Rule provides that the party opposing the motion shall serve a similar statement of material facts as to which the party contends there is a genuine issue to be tried, using the same format.  Facts set forth in Defendants' statement will be deemed admitted (if supported by the record evidence) unless controverted by Plaintiff's statement.

Plaintiff has presented a declaration stating that he reviewed 2,696 documents.  Plaintiff's Ex. Q (doc. 87 at 5-6).  Plaintiff wanted to obtain 93 copies of those documents, but lacked funds to pay for the copies.  Id. at 6.

**The relevant Rule 56(e) evidence**

Plaintiff had blood work on July 11, 2012, "to test for intolerance to gluten."  Defendant's Ex. A (doc. 74-1 at 5), Ex. B (doc. 74-1 at 7).[4]  Plaintiff's levels were in the "none detected" range when tested for Crohn's Disease and celiac sprue, indicating

---

[4] All references are to the title of the hard paper copy, followed by a reference (in parenthesis) to the corresponding document and page(s) in the electronic docket.  Both are referenced as a pro se prisoner does not have access to the electronic docket.

Plaintiff "is not intolerant to gluten."  Defendant's Ex. A (doc. 74-1 at 5).  Plaintiff

disputes that evidence and declares that although the test results were negative, a

person may still have celiac disease but stopped eating foods with gluten before being

tested.[5]  Doc. 79 at 2.  Nevertheless, the evidence reveals that when Plaintiff arrived at

Sumter Correctional Institution, "he came with the Celiac diagnosis."  Defendant's Ex. A

(doc. 74-1 at 3).  Beyond Plaintiff's assertions of his allergy to wheat, notations in

Plaintiff's medical records reveal that Plaintiff is at least considered to have celiac sprue.

Defendant's Ex. A (doc. 74-3 at 22, 24, 26, 30, 55, 58-60, 75).

Dr. Rafael Rosa treated Plaintiff at Sumter C.I. and states that he "saw no

evidence" that Plaintiff suffered from celiac symptoms and notes that he "presented as a

healthy individual."  Defendant's Ex. A (doc. 74-1 at 4).  Plaintiff made "subjective claims

of diarrhea, loose and foul stools, but that was not substantiated by objective

observations."  *Id.*  At one point, Plaintiff was removed from the gluten free menu

because "he was caught eating gravy, which was not gluten-free."  *Id.*  Plaintiff went on

a hunger strike and lost weight, causing Dr. Rosa to place Plaintiff on a "food trial . . . to

determine whether and to what extent he was having" the symptoms as reported.  *Id.*

Plaintiff was put on the regular diet and directed to "call the nurses after every bowel

movement; however, the records reflect that he did not do so consistently."  *Id.*[6]  Dr.

─────────────────

[5] The Department's Allergy list explains that celiac disease is diagnosed by a blood
test.  Defendant's Ex. O (doc. 74-3 at 18).  "If test results are negative but celiac
disease is still suspected, additional blood tests may be needed."  *Id.*  "Before being
tested, one should continue to eat a diet that includes foods with gluten, such as breads
and pastas."  If a person stops eating foods with gluten before being tested, the results
may be negative for celiac disease even if the disease is present."  *Id.*

[6] Plaintiff disputes that assertion in his deposition testimony.  Defendant's Ex. J (doc.
74-2 at 71-72).  Plaintiff also contends in his Sworn Declaration that he does not miss

Rosa declares that the nurses were not able to verify his reported symptoms and, thus, he was continued on the regular diet.  *Id.*  Once again, Plaintiff went on another hunger strike and Dr. Rosa re-instituted the gluten-free diet pass.[7]  *Id.*

Dr. Rosa explains that although Plaintiff has been given Loperimide to be taken "as needed," it is "because of his subjective and repeated complaints, but not due to weight loss or any objective findings."  Defendant's Ex. A (doc. 74-1 at 5).  Additionally, Plaintiff has been given an analgesic balm ("essentially Ben Gay") to be taken on an as needed basis based on Plaintiff's subjective complaints.  *Id.*  Plaintiff's complaints of migraine headaches are likely the result of a head injury Plaintiff sustained in "a car accident and a condition involving his eye, which causes sun sensitivity and for which he has received solar shields."  Defendant's Ex. A (doc. 74-1 at 5-6).  Dr. Rosa declares that Plaintiff's "headaches and the prescription of Excedrin Migraine are not related to gluten exposure."  *Id.* at 6.  Plaintiff admitted in his deposition that he has had an issue with migraine headaches when exposed to bright light since the age of ten.  Defendant's Ex. J (doc. 84-2 at 10-11).  Plaintiff has histoplasmosis and is photophobic.  *Id.* at 10.

Defendant's duties include formulating Departmental "policies and procedures relating to dietary issues and prevention of inmate health related problems; monitoring the Department's nutrition and dietary components to assure compliance with all applicable laws, rules and procedures . . .; conducting nutritional analyses of food

---

"more than 9 meals a month" because if he did, he would receive a disciplinary report or be taken off the diet.  Doc. 79 at 13-14.

[7] Although Plaintiff denied in his deposition that he went on hunger strikes, he does admit going for three or four days without eating any meals.  Defendant's Ex. J (doc. 74-2 at 69, 72).  Plaintiff's medical records state "Celiac sprue/ on hunger strike."  Defendant's Ex. A (doc. 74-3 at 22).

products under consideration for inclusion on the Department's various menus; and performing nutritional evaluations of and certifying the Department's Master Menu Program . . . ."  Defendant's Ex. C (doc. 74-1 at 9).

Inmates in the Florida Department of Corrections have several menu options: they may choose "the Master Menu, which provides regular meals for inmates who do not have prescriptions for therapeutic diets or any diet restricts," or a vegan diet, for inmates "who do not wish to eat any animal products/byproducts," or as a third option, they may have the "alternative entrée" which is for inmates "who do not wish to eat meat or meat by products," or for other reasons, do not want the regular entrée. Defendant's Ex. C (doc. 74-1 at 10).  The Master Menu is to be followed although, "specific menus and menu items are subject to change due to production/equipment issues, product availability, security concerns, use of farm products or USDA commodities, or as authorized by the Warden."  *Id.* at 10.  If an item must be substituted, it "will be from the same food group as the original item."  *Id.*

The Department also offers "therapeutic diets" which are "modifications of the Master Menu, with alterations to meet the requirements of a specific medical condition for those inmates who have diet prescriptions."  Defendant's Ex. C (doc. 74-1 at 11). Therapeutic diets exist for such conditions as pre-dialysis, dialysis, mental health, fat intolerance, calorie regulated, and the like.  *Id.*  Some foods "are also served to the general population, but the therapeutic diet meals are prepared and served in a different area from the master menu meal."  *Id.*  Therapeutic diets "are planned, prepared, and served modifying the Master Menu as little as is needed in order to avoid unjustified

budgetary burdens, while giving full consideration to the individual's therapeutic and nutritional needs."  *Id.*

"Specialized diets are also planned on an individualized basis for food allergies or intolerance (i.e., gluten or lactose) when prescribed by a physician."  Defendant's Ex. C (doc. 74-1 at 11).  The gluten-free diet "is much less common than the approved list of therapeutic diets contained within the Master Menu Manual."  *Id.*  Because it is "so uncommon and is prescribed and specially planned for a very small number of inmates, the Master Menu Manual does not contain a substitution list for the gluten-free diet." Defendant's Ex. C (doc. 74-1 at 12).  That does not mean, however, "that no substitutions can be made to the gluten-free diet."  *Id.*  For example, "when ground beef was no longer available because of changes to the Master Menu, 100% ground turkey or chicken was substituted."  *Id.*  "Also, when a fruit item is removed from the Master Menu, other fruits can be substituted."  *Id.*  "The Food Service Directors have been advised that, as long as the substituted item is a fruit or vegetable or a meat item, they can be substituted because the meat, fruits and vegetables[8] served by the Department are gluten-free."  Defendant's Ex. C (doc. 74-1 at 12).  "The Diet Manual contains information concerning Celiac Disease and intolerance to gluten within the allergy section."  *Id.*

The Master Menu Manual contains recipes with "ingredients, amounts, and the methods of preparation."  *Id.*  Defendant avers that the "[r]ecipes must be followed to ensure the nutritional integrity of the Master Menu."  *Id.*  "The Food Service Directors

---

[8] "[A]ll vegetables are prepared by food service without meat, meat fat, meat-based broth, butter or other seasonings added to the vegetables."  Defendant's Ex. C (doc. 74-1 at 10).

and the food service staff at the institutions receive training to follow recipes exactly without deviation."  *Id.*  "[F]ood service workers are not to deviate from the recipes and menu items provided to them . . . ."  *Id.* at 15.

Defendant approved and issued gluten-free diets on February 12, 2010; October 14, 2011; February 26, 2012; and July 1, 2012.  Defendant's Ex. C (doc. 74-1 at 12). Defendant states in her affidavit that she did not issue a diet menu on May 5, 2010, or in July, 2011, as claimed by Plaintiff.  *Id.* at 13.

Heather Fleming was employed by the Department of Corrections between 2010 and 2012.  Defendant's Ex. G (doc. 74-1 at 98).  She was the dietitian who created the four gluten-free menus since February 12, 2010, and she has "Celiac Disease and must eat a gluten-free diet."  *Id.*  She began "by checking food labels for sources of gluten." *Id.*  If any ingredients "were of undeclared or unknown origin," Fleming "contacted the manufacturer to determine if the items contained any hidden sources of gluten."  *Id.*   "If the items did contain any form or source of gluten, she did not put them on the menu." *Id.*

Defendant disputes Plaintiff's claim that many food items are on the menu and contain hidden sources of gluten.  *Id.* at 13-14.  She contends his "claims are completely unsupported and false."  *Id.* at 14.  "It a product contains wheat, the manufacturer is required to state that in its ingredient list, as gluten is one of the top ten allergens."  *Id.*  Further, Defendant declares that no gluten-free menu food item contains cereal fillers, preservatives, or emulsifiers containing gluten.  *Id.*  "Any modified food starch, maltodextrin, santham gum and caramel color" on the gluten-free menu is from

corn and the "textured vegetable protein is made from soy." *Id.*; *see also* Defendant's

Ex. G (doc. 74-1 at 98-99).

Defendant points out that should Plaintiff dislike, or otherwise be concerned that

a particular food item has gluten, "he is always free to eat the alternate entrée."

Defendant's Ex. C (doc. 74-1 at 14).   "The alternative entrees are cooked dried beans,

peanut butter or fortified cheese slices, all of which are gluten-free." *Id.; see also*

Defendant's Ex. D (doc. 74-1 at 22).

To the degree Plaintiff complains that "when he arrives at a new institution, they

do not have his diet available," Defendant agrees that "would be true."  Defendant's Ex.

C (doc. 74-1 at 9).  Food service "would have no notification of where [Plaintiff] was

being transferred."  Defendant's Ex. D (doc. 74-1 at 23).  "However, once Health

Services sends a diet prescription[9] to Food Services, the Food Service Director may

obtain the Gluten-free Menu from the Public Folders (where the Master Menu Manual is

located) or he/she may contact [Defendant] for the current Gluten-free Menu."

Defendant's Ex. C (doc. 74-1 at 14-15).

Food service staff, including food workers, "are trained in the provision of

therapeutic diets, the importance of avoiding cross-contamination of foods and in food

safety." *Id.* at 15.  Moreover, there are specific procedures in place for the proper

"cleaning of pots and utensils after each use." *Id.* at 15-16.  Procedure 604.301 directs

---

[9] A therapeutic diet must be prescribed by a physician, clinical associate, or dentist.
Defendant's Ex. A (doc. 74-1 at 37).  Procedure 204.002 directs that if an inmate is
transferred to another institution, the therapeutic diet is to continue until the physician at
the new institution reviews the diet prescription for medical necessity. *Id.* at 38.  Once
determined that the diet prescription should be renewed, it is re-written and an original
prescription must be sent to food service. *Id.*

that the food service director must "provide food safety/sanitation training to inmates assigned to food service."  Defendant's Ex. E (doc. 74-1 at 72).  The Procedure directs that the following items must be cleaned after each use: cooking utensils, mixing utensils, hand utensils, containers, grills, steam kettles, can openers, work surfaces, mixers, slicers, grinders, saws, deep fat fryers, skillets, vegetable peelers, sinks, beverage dispensers, trays, tumblers, and cups.  *Id.* at 73-74, 84-85.

Should Plaintiff mistakenly pick up the wrong tray, or another inmate accidentally take his tray, Plaintiff "should advise staff that the tray does not contain the food that is on his diet and a tray containing the food for his diet will be provided to him." Defendant's Ex. C (doc. 74-1 at 16).  Staff are "not permitted to substitute items on his tray or change his meals to entertain his unrelenting claims that specific food items on his diet contain gluten."  *Id.*

Defendant addressed Plaintiff's claims of weight fluctuations in her affidavit as well.  Defendant's Ex. C (doc. 74-1 at 16-17).  Defendant points out that at Plaintiff's lowest weight of 156, he is still "20 pounds higher than the bottom" of the "healthy weight" range for a person who is 5'11".  *Id.* at 16.  When Plaintiff was at his highest weight of 214 pounds, he was overweight and just "one pound below the obese category."  *Id.*  Defendant reviewed Plaintiff's canteen purchases[10] and found Plaintiff "purchased items that contain gluten, such as ice cream sandwich, Marchuan Instant Chicken Lunch, Twix bars, Famous Amos cookies and oatmeal raisin cookies."  *Id.* at

---

[10] Procedure Number 204.002 permits the Food Service Director to "check canteen purchases" for inmate's receiving special meal plans such as the vegan meal or a therapeutic diet to ensure compliance.  Defendant's Ex. E (doc. 74-1 at 31, 38).  If an inmate is found eating improper foods, he will be removed from that meal plan.  *Id.*

17.  In addition, Plaintiff also purchased items from the canteen which contain hidden

sources of gluten such as: BC Beef Stew, BC Chili with Beans, Barbecue Potato Chips,

Coke, Diet Coke, Cheese Puffs, Nacho Cheese Tortilla Chips, Pulled Chicken with

Buffalo Sauce, Root Bear and Steak Sauce.  *Id.*; *see also* Defendants' Ex. V (doc. 74-4

at 1-48).  In response to Plaintiff's complaint that he must go hungry because his food

tray contains gluten, Defendant states in her affidavit that Plaintiff "could eat the

alternate entrée, which never contains meat or meat by products" and the vegetables

"are always gluten free, because they are prepared without meat, meat fat, meat-based

broth, butter or additional seasonings added."  *Id.*

Defendant presented the affidavit of Sharon Richmond, a registered dietitian,

who was employed by the Department of Corrections during the relevant time period of

the complaint.  Defendant's Ex. D (doc. 74-1 at 19).  Richmond advises that she never

told Plaintiff that "the Department relies solely on labels when placing items on the

gluten-free menu."  *Id.* at 22.  Rather, "the Department starts with labels but would then

investigate further if any question existed."  *Id.*  Richmond had "repeated conversations"

with Plaintiff concerning his diet, and she reports that Plaintiff "was unyielding and

simply refused to believe what he was told."[11]  *Id.*  Richmond also emphasizes that if

Plaintiff disliked or had concerns that a "particular item on any given day has gluten, he

was always free to eat the alternate entrée."  *Id.*

---

[11] A "Site Visit Report" dated March 17, 2010, also indicated that several prison
officials (but not Defendant Fuhrman) met with Plaintiff to discuss his concern that
changes made in the gluten free menu does not follow NIH guidelines.  Defendant's Ex.
P.  Assurances were made to Plaintiff "that there was no gluten in the menu."  *Id.*
Plaintiff "still does not believe" the assurances.  Plaintiff was encouraged to "try some of
the food in question with a doctor or nurse present so that they can indicate in his
medical chart whether he reacts to it or not."  *Id.*  Plaintiff was "not ready to do" so.  *Id.*

Richmond explains that paddles are used for "large kettles of food, and each kettle had its own paddle."  Defendant's Ex. D (doc. 74-1 at 24).  Glutten-free items are "in much smaller inserts with their own utensils."  *Id.*  "There was no switching back and forth of utensils between food that [Plaintiff] received and food containing gluten."  *Id.*  The utensils are not mixed, and "utensils, pans and inserts were also thoroughly cleaned before being used to hold different food items."  *Id.*

Defendant presented Plaintiffs medical records which show that between 2007 and February 12, 2010, Plaintiff was on a gluten-free diet yet still reported similar medical problems which he could not explain such as fatigue, dizziness, headaches, memory loss, and both weight gain and weight loss.  Defendant's Ex. J (doc. 74-2 at 58-64); Ex. U.  In addition, Plaintiff was taken off his gluten-free menu in 2009 because of his canteen purchases and bartering his food.  Ex. J at 209-210.  Plaintiff stated in his deposition that he was taken off the diet for a couple of months in 2009 because a food service worker was not properly recording that Plaintiff was receiving his gluten-free tray in the mornings.  Defendant's Ex. J (doc. 74-2 at 23).

The evidence contains an affidavit of William Patrick who was assigned as Security Supervisor for Food Service and routinely encountered Plaintiff.  Defendant's Ex. K (doc. 74-3 at 1).  At least twice, Patrick observed Plaintiff "trade items from his gluten-free tray for items containing gluten from other inmates' trays."  *Id.* at 1-2.  Patrick also observed Plaintiff "mixing gravy, which he had obtained from another inmate, in with his food."  *Id.* at 2.  Gravy is not gluten free.  *Id.*  Patrick also saw Plaintiff "eating a cookie and with cookies in his hand."  *Id.*  Carolyn White is a Food Service Director at Polk Correctional Institution and she states in her affidavit that she also saw Plaintiff

trade food from his gluten-free tray with other inmates.  Defendant's Ex. M (doc. 74-3 at

9.  She saw him "trade for and eat cookies, which contain gluten and are not permitted

on his diet."  *Id.*  She also observed Plaintiff "trade for an eat peanut butter sandwiches"

at least twice. *Id.*  "Bread contains gluten and is not permitted on his diet."  *Id.* at 9-10.

Plaintiff was also observed "eating chips from the canteen and eating cheese spread,

which was not on his menu."  *Id.* at 10.  White states that Plaintiff "failed to report for

some of his meals and frequently refused to eat the items being fed to him, even though

they were exactly what had been ordered as his diet . . . ."  *Id.*  White reiterates that

Plaintiff could have chosen the alternate entrée if he did not like his meal.  *Id.*  It

appeared to White that Plaintiff "expected to be catered to and refused to eat what was

prepared for him, then would eat cookies or other food that was not on his diet."  *Id.*

Plaintiff disputes that he traded food.  Doc. 79 at 10-11.  Plaintiff advises that

Procedure 401.009(f)(2) would require White and Patrick to issue him a disciplinary

report for bartering his food, and he states no "report was filed against Plaintiff . . . ."  *Id.*

at 11.  Plaintiff also contends that the purchase of items such as the ice cream

sandwich, Twix bar, Famous Amos cookies, oatmeal raisin cookies, rowdie spicy rid,

buffalo wings, and root beer were purchased at the visiting park canteen for his two

children.  Doc. 79 at 12.  Plaintiff points out that Defendant "has no evidence of what

plaintiff did with any item he purchased from the canteen."  *Id.*  Plaintiff "admits to

purchasing gluten but disputes that he intentionally ate gluten other than when diet pass

was taken."  *Id.*

Patrick also denies Plaintiff's claim that he could see the paddles used to serve

his food and that food is cross-contaminated.  Defendant's Ex. K (doc. 74-3 at 2).  From

the dining area, Plaintiff could not "see the food being placed on his tray in the diet tray preparation area." *Id.*  A declaration by inmate Pearson disputes that and states that when picking up his diet tray for a "low-residue" diet, Peason "can see the cooking trill, large kettles, bake area, prep tables and vegetable area in food service."  Plaintiff's Ex. L (Pearson declaration, doc. 79 at 63).

In addition, Patrick states that the "paddles are for the large kettles of food" and "gluten-free items are in much smaller inserts with their own utensils." *Id.*  "There would be no switching back and forth of utensils" because gluten-free food has "its own utensils." *Id.*  Patrick's testimony is also substantiated by the affidavits of Audra Hebert, Defendant's Ex. L (doc. 74-3 at 5), and Carolyn White.  Defendant's Ex. M (doc. 74-3 at 9).

Plaintiff has presented several sworn declarations of other inmates who state that while working in food service, they have personally seen "inmate food service workers use pots, pans, and utensils that are not completely clean from previous meals used to cook and store food that is then served to diet inmates.  Plaintiff's Ex. D (Edwards declaration, doc. 79 at 38-39); Plaintiff's Ex. E (Stohlberg declaration, doc. 79 at 43); Plaintiff's Ex. F (Williams declaration, doc. 79 at 46); Plaintiff's Ex. G (Schaell declaration, doc. 79 at 50); Plaintiff's Ex. H (Thompson declaration, doc. 79 at 53); Plaintiff's Ex. I (Hamm declaration, doc. 79 at 56); Plaintiff's Ex. J (Owens declaration, doc. 79 at 60); *see also* Plaintiff's Ex. K (Scott declaration, doc. 87 at 13-14).  Inmate Sharp also states that Defendant Fuhrman visited Sumter Correctional Institution in mid-February and watched him "use pans that were not adiquately [sic] cleaned." *Id.* at 16.

The inmates have seen "inmate food service workers use the same cooking utensils to mix, stir, flip multiples types of foods without cleaning the utensils between uses."  Plaintiff's Ex. D (Edwards declaration, doc. 79 at 38-39); Plaintiff's Ex. E (Stohlberg declaration, doc. 79 at 43); Plaintiff's Ex. F (Williams declaration, doc. 79 at 46);  Plaintiff's Ex. G (Schaell declaration, doc. 79 at 50); Plaintiff's Ex. H (Thompson declaration, doc. 79 at 53); Plaintiff's Ex. I (Hamm declaration, doc. 79 at 56); Plaintiff's Ex. J (Owens declaration, doc. 79 at 60).

Similarly, the inmates state they have seen other "inmate food service workers use trays not completely clean from previous meals used to serve diet inmates."  Plaintiff's Ex. D (Edwards declaration, doc. 79 at 38-39); Plaintiff's Ex. E (Stohlberg declaration, doc. 79 at 43); Plaintiff's Ex. F (Williams declaration, doc. 79 at 46); Plaintiff's Ex. G (Schaell declaration, doc. 79 at 50); Plaintiff's Ex. H (Thompson declaration, doc. 79 at 53); Plaintiff's Ex. I (Hamm declaration, doc. 79 at 56); Plaintiff's Ex. J (Owens declaration, doc. 79 at 60).

They have seen "food service workers prepare food on surfaces that were not completely clean of food matter that was later served to diet inmates."  Plaintiff's Ex. D (Edwards declaration, doc. 79 at 38-39); Plaintiff's Ex. E (Stohlberg declaration, doc. 79 at 43); Plaintiff's Ex. F (Williams declaration, doc. 79 at 47); Plaintiff's Ex. G (Schaell declaration, doc. 79 at 51); Plaintiff's Ex. H (Thompson declaration, doc. 79 at 54); Plaintiff's Ex. I (Hamm declaration, doc. 79 at 57); Plaintiff's Ex. J (Owens declaration, doc. 79 at 61).  In particular, inmate Scott Sharp, Jr., states in his declaration that "[t]he grill is used to cook pancakes then used to cook eggs for the gluten-free diets without being cleaned between uses."  Plaintiff's Ex. K (Sharp declaration, doc. 87 at 14).

Plaintiff provided the affidavit of inmate Stohlberg who has also been diagnosed with celiac.  Plaintiff's Ex. E (Stohlberg declaration, doc. 79 at 40-44).  Stohlberg asserts that he had previously been assigned to work in food service as a "diet cook."  *Id.* at 41.  Stohlberg declares that he "was never given any training in how to provide a safe gluten-free meal while I was a diet cook," nor did he see other cooks receiving any such "detailed training."  *Id.*  Inmate Williams also states that he was not "given specific training in how to safely prepare and serve a diet tray without gluten."  Plaintiff's Ex. F (Williams declaration, doc. 79 at 47); *see also* Plaintiff's Ex. I (Hamm declaration, doc. 79 at 57); Plaintiff's Ex. K (Sharp declaration).

Stohlberg states that he has personally had adverse reactions to food provided which is declared gluten-free, but nevertheless has reactions consistent to how his body reacts to gluten.  *Id.* at 41-42.  Stohlberg believes the foods have come in contact with gluten.  *Id.*  Moreover, inmate Pearson states that he has seen "food serve staff an inmate workers give foods like bread, pasta, cake and cookies" to Plaintiff which he "refused to accept."  Plaintiff's Ex. L (Pearson declaration, doc. 79 at 64).  When Plaintiff refused the food items, the "workers would normally scrap[e] the food item off and replace it with what he should" have received.  *Id.*  On at least one occasion, Plaintiff was given a tray "that had rice with bread on top."  *Id.*  Plaintiff complained and the worker took the bread off the rice and gave him the tray.  *Id.*

In addition, Sharp states in his declaration that he has "been ordered to serve the gluten-free diets mean taken from foods such as chili mac and casserole."  Plaintiff's Ex. K (doc. 87 at 15).  Sharp also has "used leftover foods that contained pasta and bread particles to serve gluten-free diets."  *Id.*  He also avers that he was "ordered by Hebert

to serve beans to the gluten-free diets that had pasta that fell into the serving pan." *Id.*
at 14.

**Analysis**

"[W]hen the State by the affirmative exercise of its power so restrains an
individual's liberty that it renders him unable to care for himself, and at the same time
fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care,
and reasonable safety--it transgresses the substantive limits on state action set by the
Eighth Amendment. . . ."  Helling v. McKinney, 509 U.S. 25, 31-32, 113 S. Ct. 2475,
2480, 125 L. Ed. 2d 22 (1993), *quoting* DeShaney v. Winnebago County Dept. of Social
Services, 489 U.S. 189, 199-200, 109 S. Ct. 998, 1005-1006, 103 L. Ed. 2d 249 (1989).
Where, as here, the claim is based upon the deprivation of food, such a claim can only
constitute cruel and unusual punishment if the prisoner is denied the "minimal civilized
measure of life's necessities." Wilson v. Seiter, 501 U.S. 294, 303 (1991).  "A
well-balanced meal, containing sufficient nutritional value to preserve health, is all that
is required." Smith v. Sullivan, 553 F.2d 373, 380 (5th Cir. 1977); *quoted in* Shirley v.
Sternal, No. 09-10045-CIV, 2010 WL 6020684, at *6 (S.D. Fla., 2010) (holding that
serving jail detainee "a vegan diet to address his purported [poultry] allergy is not so
extreme to rise to a constitutional violation."); *see also* Hamm v. DeKalb Cnty., 774 F.2d
1567, 1575 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986) (finging that "[t]he fact
that the food occasionally contains foreign objects or sometimes is served cold, while
unpleasant, does not amount to a constitutional deprivation.").

To prevail on an Eighth Amendment claim, Plaintiff must prove a (1) condition of
confinement that inflicted unnecessary pain or suffering (the objective component), (2)

deliberate indifference to that condition (the subjective component), and (3) causation. LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994) (citations omitted).  Under the objective component the prisoner must not only show that a condition "pose[s] an unreasonable risk of serious damage to his future health or safety" but also that the "risk of which he complains is not one that today's society chooses to tolerate."  Chandler v. Crosby, 379 F.3d 1278, 1289-90 (11th Cir. 2004), *quoting* Helling, 509 U.S. at 36, 113 S.Ct. at 2482.  In other words, the challenged condition must be "extreme" and violate "contemporary standards of decency to expose *anyone* unwillingly to such a risk."  Chandler, 379 F.3d at 1289, *citing* Helling, 509 U.S. at 36, 113 S.Ct. at 242.  Restrictive or even harsh conditions alone do not rise to the level of an Eighth Amendment violation, the prisoner must show he is "deprive[d] . . . of the minimal civilized measures of life's necessities"  Rhodes v. Chapman, 452 U.S. 337, 345–46, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59 (1981), *quoted in* Chandler, 379 F.3d at 1289.

Under the subjective component, a plaintiff must show that prison officials were deliberately indifferent to a known, substantial risk of serious harm.  Helling, 509 U.S. 25, 113 S.Ct. at 2480;  Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1982–83, 128 L.Ed.2d 811 (1994); Chandler, 379 F.3d at 1290.  To demonstrate deliberate indifference, a prison official's conduct must be "more than mere negligence."  Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).  It must be a culpable state of mind to unnecessarily and wantonly inflict pain or harm to a prisoner.  Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

The third element to Plaintiff's § 1983 case is causation.  Plaintiff must show that Defendants' "acts or omissions were the cause--not merely a contributing factor--of the constitutionally infirm condition."  LaMarca, 995 F.2d at 1538.  Once this causal connection between Defendants' acts and the constitutional deprivation has been shown, Plaintiff must then demonstrate that his injuries were proximately caused by such deliberate indifference.  Id., at 1539.

Although Defendant has argued that Plaintiff has not be shown "to be gluten intolerant," the medical records demonstrate that Plaintiff is deemed to have celiac's disease, an autoimmune disorder.  Thus, notwithstanding the blood tests, it is accepted that ingesting gluten may damage Plaintiff's small intestine and place him at risk for other health complications.

The evidence in this case reveals that the Defendant has not been unresponsive to the health needs of inmates like Plaintiff who, for a variety of reasons, may be directed by medical professionals to avoid gluten.  As part of her duties, Defendant has formulated policies and procedures relating to dietary issues.  Defendant has created various "therapeutic diets," including a gluten-free diet.  That diet was designed and created with input from a dietician who has celiac disease and must also eat a gluten-free diet.  All foods and ingredients are scrutinized to ensure there are no sources of gluten.  The first step in the process involves checking food labels for gluten.  If any ingredients are unknown or undeclared, the dietician took a second step and contacted the manufacturer to determine if the item contained any "hidden sources" of gluten.  If a source of gluten was present, the item was not included on the gluten-free diet menu.

The gluten-free diet menu is "much less common" and "specially planned for a very small number of inmates."  If a substitution must be made to the menu, feed service directors may substitute the item with another fruit, vegetable or meat item because those items are gluten-free.  Moreover, the evidence is undisputed that if Plaintiff dislikes or, for any reason, does not want the gluten-free menu for a particular meal, Plaintiff may choose the alternate entrée which is also gluten-free.  Plaintiff, thus, has gluten-free options available to him at every meal.

The Diet Manual contains information on celiac disease and gluten intolerance. In addition, Defendant created specific procedures in place to ensure pots, utensils, work surfaces, containers, trays, and the like are properly cleaned "after each use."  *Id.* at 15-16.  Those policies and procedures are in place to avoid the contamination issue Plaintiff raises in this lawsuit.  Procedure 604.301 also directs that food safety and training must be provided to inmates who work in food service.  There is no evidence that Defendant Fuhrman has been deliberately indifferent to Plaintiff's need for a gluten free diet.  She has created an appropriate menu, policies to train staff and workers, and procedures governing the sanitation of the prison kitchen to ensure safety to the inmates in the food.

Plaintiff has come forward with evidence showing that foods are not always prepared separately required by the Procedure.  Plaintiff and other inmate witnesses have submitted affidavits which attest that food service workers have cross contaminated food by switching utensils back and forth, failing to properly clean the work surfaces as well as clean pots, pans, utensils, trays, and the like.  Plaintiff has presented evidence that some inmate workers use the "same cooking utensils to mix,

stir, flip multiples types of foods without cleaning the utensils between uses."  That evidence is insufficient, however, because those negligent omissions are not due to conduct by the Defendant.  Those omissions are made by Plaintiff's fellow inmates and have not been shown to be a result of, or connected to, and conduct of the Defendant. The Defendant has put policies and procedures in place to prevent such conduct. Claims that not all persons working in food service are complying with those conditions are not violations which are properly placed on Defendant's shoulders.  There is no evidence that Defendant Fuhrman was made aware that her policies and procedures were not being followed.  There is no evidence of any grievance having been directed to, and received by, the Defendant.  *See* Defendant's Ex. Y (doc. 74-5).  There is no evidence of a widespread history of failures to comply with the Defendant's procedures that put the Defendant on notice of the need for greater training, enforcement, or compliance procedures.

To the degree Plaintiff has brought forward evidence which shows that some food substitutions are made which are not gluten-free, or even that Plaintiff is in disbelief that some foods served on the gluten-free menu are truly free of all gluten and contaminates, Plaintiff has not shown that the alternate entrée is not sufficient to meet his nutritional needs without causing him harm.  It does not appear that Plaintiff is ingesting quantities of gluten which cause him harm.  Indeed, Plaintiff's dispute as to why the blood test could show he is not gluten intolerant is based on his argument that when "a person stops eating foods with gluten before being tested, the results may be negative for celiac disease."  Doc. 79 at 2.  Nevertheless, Plaintiff is able to avoid

gluten-free food and has menu options available to him which comply with the Eighth
Amendment.

It is often true in cases which challenge prison menus and food choices, that
prison officials prevail in such cases based on a showing that the prisoner could achieve
a proper diet through selectively choosing proper foods from the menu choices with
dietary teaching.  Smith v. Masenburge, No. 6:11 cv415, 2012 WL 527570, at *6
(E.D.Tex. Jan.18, 2012), Mejia v. Goord, No. A.903cv124, 2005 WL 2179422 (N.D.N.Y.
Aug.16, 2005), Rivera v. Dyett, Nos. 88 Civ. 4707, 90 Civ. 3783, 1994 WL 116025
(S.D.N.Y. Mar. 28, 1994).  A prisoner's dissatisfaction with a limited variety of food
provided on special diets is insufficient to state a claim.  Escalante v. Huffman, 2011 WL
3107751, at *9 (W.D.Va. July 26, 2011); Palmenta v. Arnone, 2012 WL 2335307, at
*4–5 (Conn.Super. May 24, 2012) (finding that prisoner's desire for a "gluten-free diet
with adequate fiber" failed to state a claim); Schiavo v. Warden, 2009 WL 765883, at *1
(Conn.Super. Mar.2, 2009) (prisoner with celiac disease who claimed he was denied a
gluten free and lactose free diet failed to show deliberate indifference).  Prisoners have
been unsuccessful in challenges to prison food because it need not be aesthetically
pleasing or particularly flavorful.  LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993),
but the diet must be nutritionally adequate to maintain health.  Berry v. Brady, 192 F.3d
504, 508 (5th Cir. 1999) (suggesting that to state Eighth Amendment claim inmate must
allege "he lost weight or suffered other adverse physical effects or was denied a
nutritionally and calorically adequate diet"); Antonelli v. Sheahan, 81 F.3d 1422, 1432
(7th Cir. 1996) (prisoner stated an Eighth Amendment claim for rancid, nutritionally
deficient diet); Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir.1992) (holding that

prisoners have the right to nutritionally adequate food); Phillips v. Dredge, No. 11-CV-3236, 2014 WL 4087430 at *2 (C.D. Ill. Aug. 19, 2014) (concluding that "Plaintiff's evidence does not support an inference of a systemic failure to provide Plaintiff a gluten-free diet, much less an inference that Defendants were deliberately indifferent to any such systemic failure.").  Here, Plaintiff has presented concerns over cross-contamination not causally connected to the Defendant.  The actions for which Defendant is legally responsible are Constitutionally sufficient.  Plaintiff has a menu and food choices that eliminates gluten and protects his health concerns.  Summary judgment should be granted in favor of the Defendant.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's motion for summary judgment, doc. 74, be **GRANTED** as Plaintiff has not established a violation of his Eighth Amendment rights.

**IN CHAMBERS** at Tallahassee, Florida, on September 11, 2014.


 S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**